UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOANN DIBIASIO,

                Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
 Social Security,

                Defendant.
_____

**REPORT
and
RECOMMENDATION**

**08-CV-0743A**

APPEARANCES:        LAW OFFICES OF WILLIAM C. BERNHARDI
                        Attorneys for Plaintiff
                        WILLIAM C. BERNHARDI, of Counsel
                        950-A Union Road
                        Suite 240
                        West Seneca, New York 14224

                        WILLIAM J. HOCHUL, JR.
                        United States Attorney
                        Attorney for Defendant
                        KEVIN D. ROBINSON,
                        Assistant United States Attorney, of Counsel
                        Federal Centre
                        138 Delaware Avenue
                        Buffalo, New York 14202

## <u>JURISDICTION</u>

      This action was referred to the undersigned by Honorable Richard J. Arcara on

January 28, 2009. The matter is presently before the court on a motion for judgment on

the pleadings filed on April 9, 2009 by Defendant (Doc. No. 15).

## <u>BACKGROUND</u>

      Plaintiff Joann Di Biasio ("Plaintiff"), seeks review of Defendant's decision

denying her Social Security Disability Insurance benefits ("SSDI"), and Supplemental

Security Income ("SSI") (together, "disability benefits") under, respectively, Titles II and

XVI of the Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined Plaintiff had the severe impairments of obesity, bilateral knee degenerative joint disease and a back disorder, that Plaintiff's depression was not functionally significant, and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1 20 C.F.R. 416.920(d), 416.925 and 416.926. (R. 16)[1]. Defendant also determined that although Plaintiff's limitations reduce her ability to perform a full range of light work, Plaintiff had the residual functional capacity to perform the representative occupations of small parts assembler and counter clerk within twelve months of the alleged onset date. (R. 20). As such, Plaintiff was found not disabled, as defined in the Act, at any time from the alleged onset date through the date of the Administrative Law Judge's decision. *Id.*

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on August 14, 2006, (R. 99) that was denied by Defendant on April 9, 2008. (R. 6). Pursuant to Plaintiff's request, filed March 6, 2007, (R. 64), a hearing was held before Administrative Law Judge Marilyn D. Zahm ("Zahm") ("the ALJ") on January 2, 2008, in Buffalo, New York. (R. 26-58). The Plaintiff, represented by Dennis C. Gaughan, Esq. ("Mr. Gaughan"), appeared and testified at the hearing. Testimony was also given by vocational expert Julie Andrews ("the VE"). (R. 26-58). The ALJ's decision denying the claim was rendered on April 9, 2008. (R. 9-21).

---

[1] "R" references are to the page numbers of the Administrative Record submitted in this case for the Court's review.

On April 24, 2008, Plaintiff requested review of the ALJ's decision by the Appeals Council (R. 4-5), which became Defendant's final decision when the Appeals Council denied Plaintiff's request for review on August 6, 2008. (R. 1-3). This action followed on October 7, 2008, with Plaintiff alleging the ALJ's decision that, as of June 9, 2005, Plaintiff was not disabled, was not based on substantial evidence in the record. (Doc. No. 1).

Following the filing of Defendant's answer on January 13, 2009 (Doc. No. 11), including the record of the administrative proceedings, Defendant, on April 9, 2009, filed a motion for judgment on the pleadings ("Defendant's motion"), together with a memorandum of law (Doc. No. 16) ("Defendant's Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be DENIED, Plaintiff's motion should be GRANTED, and the matter remanded for calculation of benefits. Alternatively, the matter should be remanded for a new hearing, consistent with this Report and Recommendation.

## **FACTS**[2]

Plaintiff, was born on October 30, 1957, has a college education, a degree in nursing, and worked as a registered nurse until June 8, 2005, when she injured her back while lifting a patient during work at the Erie County Medical Center. (R. 33, 99). At the date of the hearing on January 2, 2008, Plaintiff was married, had two grown children, and lived with her husband and daughter. (R. 32). Plaintiff returned to light

---

[2]Taken from the pleadings and the administrative record.

duty work at the Erie County Medical Center from April 2006, to June 2006. (R. 135). Plaintiff alleges she is unable to work because of her lack of concentration, ability to organize things, and back pain resulting from her injury on July 8, 2005. (R. 43-44).

On July 14, 2005, Occupational Therapist Mary Orrange ("OT Orrange"), performed a functional capacity evaluation on Plaintiff who exhibited mild limitations in the ability to bend, stand, kneel, climb stairs, and squat, leading OT Orrange to refer Plaintiff to a work conditioning program for four weeks. (R. 288-90). On August 22, 2005, Plaintiff was evaluated at Buffalo Ergonomics and Rehabilitation Services for evaluation of severe neck pain. (R. 283-84). Occupational Therapist Denise Clark-Voelker ("OT Clark-Voelker") examined Plaintiff, finding increased tightness and tension in the neck and bilateral shoulder area, normal range of motion of the trunk, decreased bilateral shoulder rotation, and no back pain. (R. 284).

On September 6, 2005, Leonard Kaplan, D.O. ("Dr. Kaplan"), performed an orthopedic consultation on Plaintiff who exhibited normal reflexes, limited side-bending on the left side (twenty-five percent), and right side (fifty percent), and lower back pain. (R. 258-59). Dr. Kaplan diagnosed Plaintiff with left sacroilic (joint that connects the spine and pelvic girdle) dysfunction, possible lumbar focal disc herniation with mild radiculitis (inflammation of the spinal nerve roots), and weak core musculature, and placed Plaintiff on temporary total disability for her nursing occupation, and temporary partial disability relative to other occupations. *Id*.

On September 14, 2005, Roy A. Hepner, M.D. ("Dr. Hepner") conducted an independent medical examination ("IME") that showed Plaintiff able to flex within four and one-half inches off the floor, normal flexion and reflexes, and normal gait and

straight leg raising[3]. (R. 232-35). Dr. Hepner noted Plaintiff's obesity, five feet five inches at two-hundred sixty-nine pounds, apportioned one-third of Plaintiff's condition to a pre-existing back condition, two-thirds of Plaintiff's condition to the injury of June 8, 2005, classified Plaintiff as mildly disabled, and noted Plaintiff's prognosis as "poor to fair, diminished by [Plaintiff's][4] obesity and her long prior history of symptoms." *Id*.

On September 19, 2005, Dr. Kaplan ordered Magnetic Resonance Imaging ("MRI") testing performed by Lawrence G. Rand, M.D. ("Dr. Rand"), that showed Plaintiff with mild to moderate spinal spondylosis (degeneration of the spine), new moderate right lateral foraminal[5] and extra-foraminal (area beyond the planes of the foraminal space) disc herniation with pressure against the L-4[6] nerve root, and bilateral facet arthropathy (joint disease) without significant spinal stenosis (narrowing of the spinal canal causing pressure on the nerves). (R. 257).

Dr. Kaplan disagreed with Dr. Hepner's medical assessment in correspondence dated September 30, 3005, stating an MRI was the appropriate diagnostic tool for Plaintiff's condition and treatment, and that denying the MRI, while, at the same time, stating two-thirds of Plaintiff's condition resulted from her June 8, 2005 accident, was "irresponsible." (R. 256). After comparing Plaintiff's September 19, 2005 MRI test

---

[3]This test is useful in detecting sciatic nerve pain, or whether a patient with lower back pain has a herniated disc, (located at the L-5 (fifth lumbar spinal nerve), S-1 (the first sacral spinal nerve), or S-2 (second sacral spinal nerve). The straight leg raising test is positive if pain in the sciatic distribution is reproduced with passive flexion of the straight leg between thirty and seventy degrees. See 2-27 Attorney's Textbook of Medicine, Manual of Traumatic Injuries § 27.04.

[4]Bracketed material added unless otherwise indicated.

[5]Foramina are spaces between the vertebrae.

[6]L4 represents a numbered lower back disc related to a location in the lumbar spine. *See* http://www.spine-health.com/conditions/back-pain/-spinal-cord-and-spinal-nerve-roots.

results to a 2003 computerized tomography ("CT scan"), Dr. Kaplan diagnosed Plaintiff with left sacroiliac joint dysfunction, L4-L5 disc herniation, L4-L5 facet arthopathy (posterior spine joint disease), and placed Plaintiff on temporary, partial, moderate-to-marked disability for all occupations. (R. 254).

On October 2, 2005, Ray W. Bergenstock, M.D. ("Dr. Bergenstock"), Plaintiff's primary internist, ordered a cardiac stress test after Plaintiff experienced new onset chest discomfort. (R. 471-72). Plaintiff's stress test was suggestive of apical anterior reversible changes (oxygen rich blood not reaching the heart muscle). *Id*. Dr. Visco opined Plaintiff's stress test result of October 2, 2005, was "false positive," and ordered a CT scan for further evaluation. (R. 472). An October 19, 2005, CT scan of Plaintiff's ascending aorta, performed by cardiologist John P. Visco, M.D. ("Dr. Visco"), showed a mildly dilated aortic root most likely secondary to hypertension. (R. 471-72). Dr. Visco recommended Plaintiff undergo treatment for hypertension and weight reduction. *Id*. On October 26, 2005, Dr. Rand performed a CT of Plaintiff's chest that showed mild fusiform (symmetrical) ectasia (mild enlargement) of Plaintiff's ascending aorta, without evidence of aneurysm. (R. 474).

Dr. Kaplan treated Plaintiff with a spinal epidural steroid injection on November 2, 2005. (R. 253-55). A follow-up examination with Dr. Kaplan on November 23, 2005, showed Plaintiff with left lumbrosacral pain and numbness in the left calf and heel, leading Dr. Kaplan to continue Plaintiff on temporary partial moderate disability. (R. 252). A scoliosis study performed by Richard D. Thomas, M.D. ("Dr. Thomas") on December 19, 2005, showed Plaintiff with a leg length discrepancy of 7 mm between the left and right hip. (R. 251).

On January 9, 2006, Dr. Kaplan re-examined Plaintiff and noted a December 19, 2005, epidural injection had not relieved Plaintiff's lumbar pain. (R. 249-50). On January 25, 2006, Plaintiff received left L4-L5 and left L5-S1 corticosteroid facet joint injections. (R 248). A follow-up examination with Dr. Kaplan on February 20, 2006, showed Plaintiff feeling "50% better." (R. 245).

On April 18, 2006, Plaintiff returned to Dr. Kaplan for an intra-articular (inside joint) knee injection. (R. 238). Dr. Kaplan continued Plaintiff on temporary, partial, moderate disability. *Id*. On June 16, 2006, Steven L. Christiansen, M.D. ("Dr. Christiansen") performed an X-ray of Plaintiff's knees and pelvis that showed moderate joint space narrowing of both knees, "hypertrophied [enlarged] left lower vetebral body transverse process and pseudoarthrosis [false joint] with the left sacral ala [winged bones below the lumbar region of the spine] . . . [and] [d]isc space narrowing . . . in the lower lumbar spine." (R. 242-44).

On March 16, 2006, Dr. Kaplan evaluated Plaintiff with no restricted motion of the lumbar region, twenty-five percent restriction of the lumbar spine with extension side-bending and left-sided rotation, and normal sensory reflex activity. (R. 240). Dr. Kaplan opined Plaintiff's knee pain was related to her injury on July 8, 2005, recommended Plaintiff continue physical therapy, and continued Plaintiff on temporary partial disability. (R. 241). A follow-up examination with Dr. Kaplan on April 18, 2006, showed Plaintiff "stronger," but with complaints of a dull ache in her lower right back and left knee pain. (R. 238). Dr. Kaplan injected Plaintiff's left knee with Depo-Medrol (a steroid anti-inflammatory), and noted a decrease in Plaintiff's left-sided pain. *Id*.

On May 18, 2006, Dr. Kaplan evaluated Plaintiff with twenty-five percent

restriction to side bending, normal tendon reflexes, abnormal perception along the S1 dermatomal distribution,[7] and a positive bilateral leg raising test result of eighty percent. (R. 236). On July 3, 2006, Andrew Cappuccino, M.D. ("Dr. Cappuccino") evaluated Plaintiff with significant narrowing at L4-L5, and concurred with Dr. Kaplan's opinion that Plaintiff remain working with light duty restrictions. (R. 263).

On July 25, 2006, an MRI test ordered by Dr. Cappuccino of Plaintiff's lumbar spine revealed "unchanged advanced disk [*sic*] degeneration . . . unchanged mild to moderate posterior spondylosis . . . unchanged moderate right foraminal and extraforaminal disk [*sic*] herniation with pressure against the right L4 nerve root . . . a small, unchanged left lateral focal disk [*sic*] herniation . . . [and] bilateral facet joint arthropathy." (R. 344). Dr. Kaplan reported in a medical source statement on July 26, 2006, that Plaintiff could return to work with restrictions to repetitive bending, lifting, twisting, and prolonged standing or sitting. (R. 417). On August 8, 2006, Dr. Bergenstock opined Plaintiff was totally disabled. (R. 260). On August 19, 2006, John Schwab, M.D. ("Dr. Schwab") performed a consultative orthopedic examination on Plaintiff, and noted Plaintiff exhibited mild to moderate restrictions to bending, lifting, carrying, and kneeling. (R. 293-96).

Plaintiff returned to Dr. Cappuccino on August 24, 2006, with complaints of persistent lower back pain radiating to the lower extremities. (R. 261). Dr. Cappuccino noted the only medical intervention he could offer Plaintiff was surgery. *Id*. Plaintiff

---

[7]Spinal nerves provide sensation to predictable areas of skin. Pain radiating down the left to the small toe in the general pattern of S1 dermatome suggests a herniating disc may be pinching the S1 nerve root of the spine. *See*, www.backpain-guide.com/Chapter_Fig_folders/Ch06_Path_Folder/4R.

attended twenty sessions of Pilates[8] between October 5, 2006 and December 14, 2006, where she received minimal relief of her symptoms. (R. 443).

On December 19, 2006, Plaintiff returned to Dr. Schwab who noted Plaintiff exhibited mild to moderate restrictions to bending, lifting, carrying, and kneeling. (R. 295-96).

Psychologist Renee Baskin, Phd. ("Dr. Baskin") conducted a consultative psychiatric examination of Plaintiff on January 26, 2007, and diagnosed Plaintiff with "[a]djustment disorder with mixed anxiety and depressed mood," but no mental disorder that would interfere with her ability to function on a daily basis. (R. 301). Plaintiff was able to follow and understand simple instructions, perform simple tasks independently, make appropriate decisions, and relate appropriately to others. *Id*.

On February 7, 2007, Dr. Cappuccino performed a repeat consultation on Plaintiff, continued Plaintiff's Pilates treatment, prescribed a gym membership to control Plaintiff's obesity, and opined Plaintiff was "totally disabled from her job." (R. 319). A residual functional capacity assessment by M. Dahlgren on February 9, 2007, showed Plaintiff able to lift twenty pounds occasionally, lift 10 pounds frequently, the ability to stand and or walk for six hours in an eight hour day, sit six hours in an eight hour day, and the unlimited capacity to push or pull. (R. 322).

On October 13, 2007, Mary Kolbert, M.D. (" Dr. Kolbert") examined Plaintiff and evaluated Plaintiff with mild tenderness in the lower lumbar muscles, and increased pain while walking on heels and toes. (R. 434). Plaintiff's left straight leg raising test

---

[8] Exercise program for spine support concentrating on the core postural muscles.

result was forty-five degrees. *Id*. Dr. Kolbert diagnosed Plaintiff with depression, prescribed Trazodone (an anti-depressant), and encouraged Plaintiff to undergo psychiatric counseling which Plaintiff declined. *Id*.

On October 17, 2007, Plaintiff was evaluated by Dr. Kaplan who noted Plaintiff exhibited twenty-five percent restriction in extension and bilateral side-bending, diminished light touch in the left L5-S1 distribution, absent left S1 reflex, and a positive left straight leg raising test. (R. 442).

On October 29, 2007, Dr. Hepner evaluated Plaintiff and opined Plaintiff's "pre-existing bilateral knee problems and her obesity constitute permanent impairments which when taken in conjunction with her back problems, create conditions materially and substantially worse than the back problems alone," and that Plaintiff "continues to have a mild, partial disability with respect to her back and that that level of disability is permanent." (R. 403-5). Plaintiff exhibited less range of motion to forward bending than in previous evaluations, tested positive in a left straight leg raising test, exhibited 2+ knee jerk reflexes, and showed mild alterations to light touch over the left lateral foot and calf. *Id*. Dr. Hepner reviewed Plaintiff's MRI test of September 19, 2005, and knee X-rays of March 16, 2006, and diagnosed Plaintiff with "symmetric degenerative joint disease that actually appears to involve all compartments." (R. 405).

On November 20, 2007, Plaintiff visited Jerry J. Tracy III, M.D. ("Dr. Tracy") for consultative pain management, who noted Plaintiff complained of increased lower back pain while reaching, pulling, pushing, and lifting. (R. 445). Dr. Tracy re-evaluated

Plaintiff on December 20, 2007, noting Plaintiff exhibited deep tendon reflexes[9] of 1/4+ at both knees and ankles, and lumbar flexion of seventy-five degrees. (R.440). Dr. Tracy diagnosed Plaintiff with moderate to severe depression, prescribed Cymbalta for pain and depression, suggested Plaintiff use a cane to assist with her gait, and noted Plaintiff stated her thinking was "not as clear as she [Plaintiff] would like." *Id*.

## DISCUSSION

**1.    Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . ..  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past relevant work, the burden shifts to the Commissioner to prove there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir. 1980).

**A.    Standard and Scope of Judicial Review**

---

[9]Deep tendon reflex tests are considered abnormal at zero, may or may not be normal at 1+ and 3+, normal at 2+, and always abnormal at 4+.

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Pollard v. Halter,* 377 F.3d 183, 188 (2d Cir. 2004) (citing *Richardson*, 402 U.S. at 401 (quoting *Consol. v. NLRB*, 305 U.S. 197, 229 (1938)).

While evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d); *Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence.  42 U.S.C. §§  405(g) and 1383(c)(3); *Dumas v. Schweiker, supra*, at 1550. "Congress has instructed . . . that the factual findings of the Secretary,[10] if supported by substantial evidence, shall be conclusive."  *Rutherford v.*

---

[10] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). Relevant evidence includes evidence from acceptable medical sources, medical reports including clinical and laboratory findings, diagnoses, prescribed treatment, residual functional capacity evaluations, and statements from non-medical sources regarding the severity of the impairment. 20 C.F.R. § 404.1513.

The applicable regulations set forth a five-step analysis the Commissioner must follow in determining eligibility for disability insurance benefits. 20 C.F.R. §§ 404.1520 and 416.920. *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464 (2d Cir. 1982). The first step is to determine whether the applicant is engaged in substantial gainful activity during the period of which benefits are claimed. 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity the inquiry ceases and the claimant is not eligible for disability benefits. *Id.* The next step is to determine whether the applicant has a severe impairment which significantly limits the physical or mental ability to do basic work activities as defined in the applicable regulations. 20 C.F.R. §§ 404.1520(c) and 416.920(c). Absent an impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant with such an impairment is unable to perform substantial gainful activity.[11] 42 U.S.C. §§

---

[11] The applicant must meet the duration requirement which mandates that the impairment must last or be expected to last for at least a twelve-month period. 20 C.F.R. §§ 404.1509 and 416.909.

423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920. *See also Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the applicant can still perform work he or she has done in the past, the applicant will be denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education, and past work experience in order to determine whether the applicant can perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed, claimant must show that he is without "the residual functional capacity to perform [her] past work"). If the Commissioner finds that the applicant cannot perform any other work, the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant bears the burden of proof as to the first four steps, while the Commissioner bears the burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In reviewing the administrative finding, the court must follow the five-step analysis to determine if there was substantial evidence on which the Commissioner based the decision. *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

**B.** **Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity. "Substantial gainful activity" is defined as "work that involves doing significant and

productive physical or mental duties" done for pay or profit. 20 C.F.R. § 404.1510(a)(b). Substantial work activity includes work activity that is done on a part-time basis even if it includes less responsibility or pay than work previously performed. 20 C.F.R. § 404.1572(a). Earnings may also determine engagement in substantial gainful activity. 20 C.F.R. § 404.1574. In this case, the ALJ concluded Plaintiff did not engage in substantial gainful activity since June 9, 2005, the onset date of the alleged disability. (R. 12). Plaintiff does not contest this matter.

### C.   Severe Physical or Mental Impairment

The second step of the analysis requires a determination whether Plaintiff had a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. §§ 404.1509, 416.909, and significantly limits the Plaintiff's ability to do "basic work activities." The Act defines "basic work activities" as "abilities and aptitudes necessary to do most jobs," and includes physical functions like walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking, understanding, carrying out, and remembering simple instructions, use of judgment; responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

The ALJ found Plaintiff had the severe impairments of obesity, bilateral knee degenerative joint disease, and a back disorder, and that Plaintiff's depression was not "functionally significant." (R. 12). Plaintiff does not contest the finding Plaintiff has the severe impairment of bilateral degenerative joint disease and a back disorder, but contests that the ALJ's finding did not consider Plaintiff's sleep apnea, positive cardiac

stress test, scoliosis with leg length discrepancy, gastroesophageal reflux disease ("GERD"), obesity, and severe depression, or Plaintiff's non-exertional functional limitations including fatigue, mental "fog" and inability to concentrate. (Doc. 1).

**D.**    **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of Impairments").  If the impairments are listed in the Appendix, and the duration requirement is satisfied, the impairment or impairments are considered severe enough to prevent the claimant from performing any gainful activity and the claimant is considered disabled.  20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d. 45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed impairments, the claimant is considered disabled"). The relevant listing of impairments in this case includes 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.02 (major dysfunction of a joint(s) due to any cause) ("§ 1.02"), and 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.04 (disorders of the spine) ("§ 1.04").  Relevant to the instant case, disability under § 1.02 is characterized by

> gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: (A) involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b. . . .

The inability to ambulate effectively is defined in 1.00B2b as

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having

insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00B2b(1).

Under § 1.04, a person may be disabled based on disorders of the spine if medical evidence demonstrates herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture, resulting in compromise of a nerve root or the spinal cord, and is accompanied by one of the following:

> A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B.   Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §1.04.

In this case, the ALJ, as required, evaluated Plaintiff's impairment under 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, directed to consideration of the Listing of Impairments, and determined Plaintiff's impairments were not accompanied by the

17

required clinical signs and diagnostic findings under the Act. (R. 12). Specifically, the ALJ concluded the record did not establish substantial evidence Plaintiff suffered the "combination of consistently positive straight leg raises with nerve root impingement, spinal arachnoiditis or pseudoclaudication" to meet the severity requisites of § 1.04, and, that Plaintiff's bilateral knee impairment did not result in the inability to ambulate effectively as defined under § 1.00B2b(1). (R. 12). Although substantial evidence in the record supports the ALJ's conclusion Plaintiff's bilateral knee impairment did not result in the inability to ambulate effectively under § 1.00B2b(1), substantial evidence in the record does not support the ALJ's finding Plaintiff's spinal injury did not meet the criteria of severity under § 1.04.

Specifically, substantial evidence supports the ALJ's finding Plaintiff's knee impairment did not result in inability to ambulate effectively defined under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00B2b(1). In particular, a July 14, 2005, functional capacity evaluation by OT Orange that showed Plaintiff with "good ability" for static sitting and standing, and ambulation activities such as walking and balance. (R. 290). Plaintiff testified she made short trips to the store, performed light household chores like laundry, gardening, vacuuming and meal preparation, and was able to travel short distances without a cane (fifty feet). (R. 37-41). Such impairment of Plaintiff's ambulatory ability, without more, does not rise to the definition of ineffective ambulation under § 1.00B2b(1). The record thus contains substantial evidence Plaintiff was able to walk without the use of a walker, two crutches or canes, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single handrail, and carry out routine

ambulatory activities such as shopping and banking, such that Plaintiff ambulates effectively as defined by 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.00B2b(1), thereby establishing that Plaintiff does not meet the criteria for disability based on Plaintiff's musculoskeletal disorder under the Listing of Impairments 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.02A, specifically major dysfunctions of joints resulting from any cause.

The ALJ's finding that Plaintiff's back impairment does not meet the criteria of § 1.04 because "[t]"he diagnostic imaging scans of the claimant's spine do not establish the combination of consistently positive straight leg raises with nerve root impingement" (R. 12), however, is not supported by substantial evidence in the record. In particular, the record provides substantial evidence Plaintiff's back disorder was characterized by evidence of nerve root compression. Specifically, on September 19, 2005, an MRI test by Dr. Rand showed Plaintiff with "advanced disc degeneration . . . mild to moderate posterior spondylosis [spinal degeneration] . . . extraforaminal disc herniation with pressure against the right L-4 nerve root [and] bilateral facet arthropathy." (R. 257) (underlining added). On July 25, 2006, an MRI test performed by Dr. Rand showed Plaintiff with "unchanged advanced disk [*sic*] degeneration [at L4-L5] . . . unchanged mild to moderate posterior spondylosis . . . [and] unchanged moderate right foraminal and extraforminal disk [*sic*] herniation <u>with pressure against the right L4 nerve root</u>." (R. 344)(underlining added). Additionally, Dr. Cappucino opined Plaintiff's MRI on July 25, 2006, revealed "bilateral spinal stenosis" consistent with Dr. Rand's diagnosis of nerve compression. (R. 261).

As required under § 1.04A, substantial evidence in the record also establishes

Plaintiff's nerve root compression was characterized by neuro-anatomic pain. In particular, a functional capacity evaluation performed by OT Orrange on July 14, 2005, showed Plaintiff experienced pain at a level between three and six on a ten-point scale over the previous thirty-day period. (R. 289). On August 22, 2005, OT Clark-Voelker noted Plaintiff described her pain as a fifteen on a one to ten scale. (R. 283). On December 19, 2006, Dr. Schwab noted Plaintiff's pain level was six out of 10 on a ten-point scale. (R. 293). On January 26, 2007, Dr. Baskin diagnosed Plaintiff with a "pain disorder associated with [her] general medical condition." (R. 301). On October 23, 2007, Plaintiff presented to Dr. Kolbert who noted Plaintiff was taking ultram (a pain reliever) and tylenol with codeine, and experienced pain at a level of four out of ten on a ten point scale. (R. 436). On December 20, 2007, Plaintiff treated with Dr. Tracy, a specialist in pain management, who noted that while Plaintiff was treated with ultram and percocet, Plaintiff's pain was a three to four out of ten on a ten point scale with only very light activity, but, when Plaintiff tried to walk or stand more than fifteen minutes, she experienced increased pain. (R. 439). Dr. Tracy opined Plaintiff's moderate to severe depression and crying spells were a result of her chronic pain and diminished level of function. *Id*.

Substantial evidence in the record also establishes Plaintiff's back disorder was characterized by limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, positive straight leg raising tests. Specifically, on January 9, 2006, Dr. Kaplan evaluated Plaintiff with fifty percent bilateral restriction,[12] twenty-five percent

---

[12]Range of motion is measured as degree of range. Normal measurement for lumbar flexion is 60, extension is 25, left lateral flexion is 25, right lateral flexion 25. See http://chiro.org/forms/romchiro.html.

side extension restriction, and decreased perception of the S1 distribution. (R. 249). On February 20, 2006, Dr. Kaplan evaluated Plaintiff with fifty-percent bilateral restriction, and decreased perception (ability to perceive sensation) along the left S1 distribution. (R. 445). An X-ray by Steven L. Christensen, M.D. ("Dr. Christensen") on March 16, 2006, of Plaintiff's pelvis showed "hypertrophied [enlarged] left lower lumbar vetebral body transverse process [part of the lumbar that serves to attach muscles and ligaments] and pseudoarthrosis [a false joint] with the left sacral ala [triangular body near base of the sacrum]. . . [and] disc space narrowing . . . in the lower lumbar spine." (R. 244). Upon examination on October 17, 2007, Dr. Tracy noted Plaintiff's S1 reflex was "absent," that Plaintiff's sensory examination revealed diminished light touch in the left L5-S1 distribution, and a twenty-five percent restriction in extension and bilateral sidebending. (R. 442). On December 20, 2007, Dr. Tracy noted Plaintiff's deep tendon reflexes were 1/4+ at both knees and ankles, forward flexion measured seventy-five degrees, lumbar flexion measured seventy-five degrees, and Plaintiff's range of motion was restricted twenty-five percent in extension. (R. 440). The record thus establishes evidence of nerve root compression accompanied by neuro-anatomic pain, limitation of motion of the spine, and motor loss accompanied by sensory and reflex loss as defined under § 1.04A. Discussion, *supra*, at 17.

Substantial evidence in the record further establishes Plaintiff's nerve root compression with lower back involvement was accompanied by positive straight-leg raising tests (sitting and supine) as required under § 1.04A. Specifically, the record establishes Plaintiff had positive straight leg tests on September 6, 2005, October 4, 2005, May 18, 2005, August 22, 2006, December 19, 2006, October 13, 2007, October

17, 2007, October 23, 2007, October 29, 2007, and November 20, 2007. (Respectively,

R. 258, 254, 236, 372, 296, 427, 400, 427, 405, 423[13]). The record thus contains

substantial evidence Plaintiff met the criteria of nerve root compression characterized

by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss

accompanied by sensory and reflex loss, and positive straight leg raising tests as

required under C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.04A, thereby establishing that

Plaintiff met the criteria for disability based on Plaintiff's spine disorder under the Listing

of Impairments 20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 1.04A, specifically,

degenerative disc disease of the cervical spine. The court therefore finds substantial

evidence in the record establishes Plaintiff is disabled under 20 C.F.R. Pt. 404, Subpt.

P, Appendix 1, § 1.04A of the Listing of Impairments.

Plaintiff's claims of GERD, hypertension, scoliosis, and severe depression, are

not supported by substantial evidence in the record, and, therefore, the court will not

discuss the claims. Further, although the record establishes Plaintiff has a history of

GERD, scoliosis, obesity, sleep apnea and a positive stress test result, such conditions

are not separately classified as impairments in the Listing of Impairments. In fact,

obesity is a factor to be considered when evaluating claims based on the

musculoskeletal (§ 1.00Q), respiratory (§ 3.00I), and cardiovascular systems (§ 4.00I).

Sleep apnea is a factor to be considered in evaluating respiratory impairments (§

3.00H). Although Plaintiff had a positive stress test, such test is a diagnostic tool for

cardiovascular disorders, (§ 4.00H), for which there is no evidence other than

---

[13]Notably, despite Plaintiff's three normal straight leg raising tests on September 14, 2005, March 16, 2006, and May 18, 2006, no treating physician considered Plaintiff's back impairment to be resolved. (Respectively, R. 234, R. 240, R. 236).

hypertension that is medically controlled. Nor, is there any evidence in the record that

Plaintiff's GERD posed any restriction to Plaintiff's ability to work.

Additionally, Plaintiff's failure to undergo Dr. Cappuccino's recommended

surgery manifestly influenced the ALJ's decision to deny benefits under 20 C.F.R. §

404.1530. (R. 17 ("He [Dr. Cappaccino] wrote [on February 7, 2007], that unless the

claimant chose to pursue a surgical intervention, his treatment would be on an as

needed basis only."); (R. 18 ("Not one of Dr. Cappuccino's notes reflects his

professional opinion that the claimant would not benefit from surgical intervention. . . .

'She [Plantiff]  is aware that the only other interventions that we would be able to offer

through this office would be some type of surgical procedure . . . . [but Plaintiff] was not

interested in pursuing any type of surgical intervention." (citing R. 351 and quoting R.

262)).  Coupled with the ALJ's failure to find, supported by substantial evidence in the

record, that if a claimant followed the suggested, but not prescribed, treatment, the

claimant's ability to work would be restored, *Patterson v. Bowen*, 799 F. 2d 1455, 1459

(11th Cir. 1986) (citing *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985)), such

improper reliance upon Dr. Cappuccino's suggested surgery constituted error further

warranting the award of benefits.  *See Teter*, 775 F.2d at 1107 (finding surgery that is

*recommended*, but not *prescribed*, is insufficient to preclude an award of disability

benefits); *Harris v. Heckler*, 756 F.2d 431, 435 n. 2 (6th Cir. 1985) (holding benefits may

not be denied because plaintiff declines to follow treatment that is merely

recommended, suggested, or offered as an alternative, as opposed to treatment being

ordered or prescribed).  Indeed, any discussion by the ALJ of  Dr. Cappuccino's

recommendation that Plaintiff undergo back surgery (R.17-18), integral to the ALJ's

analysis of the record that Plaintiff was not disabled, is tantamount to an acknowledgment by the ALJ that the record contains substantial evidence Plaintiff suffered from nerve root compression that warranted surgical intervention. (R. 16-18). Plaintiff's decision to elect conservative treatment over surgical intervention, faulted by the ALJ (R. 18-19), however, does not in itself provide a reason for a denial of benefits; rather, as the ALJ's discussion of the recommended surgery demonstrates, to receive benefits, a claimant must follow *physician-prescribed* treatment, and, if the treatment can restore the claimant's ability to work, the claimant must proffer acceptable reasons for failing to follow the prescribed treatment. 20 C.F.R. § 404.1530.[14]

In this case, although finding it necessary to consider Dr. Cappuccino's recommendation of surgery and Plaintiff's declination, the ALJ failed to find that the recommended back surgery would restore Plaintiff's ability to work, and the record is devoid of any evidence the surgery would restore Plaintiff's ability to work. Moreover, where, as here, a physician "suggests" surgical intervention, such recommendation does not rise to the level of "prescribed treatment." *Schena v. Secretary of Health &*

---

[14] Acceptable reasons for failure to follow prescribed treatment, include

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
(2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in loss of vision and is not subject to improvement through treatment.
(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
(4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
(5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. § 404.1530(c).

As here, surgery was not prescribed, Plaintiff's reasons for declining to pursue such surgery are irrelevant and need not satisfy this regulation.

*Human Services,* 635 F. 2d 15, 19 (1st Cir. 1980) (medical reports indicating surgery would improve claimant's condition did not support ALJ's determination the rejected back surgery could restore claimant's ability to work and such determination erroneously disregards language of regulation which speaks of a failure to follow "prescribed" treatment), and 20 C.F.R. § 404.1530(a)(4) provides that the risk and magnitude of a surgical procedure are reasons for a claimant not to follow a prescribed treatment. *Young v. Califano,* 633 F.2d 469, 473 (6th Cir. 1980) (finding of disability proper where claimant followed conservative non-surgical prescribed treatment and refused back surgery that was not prescribed). Thus, the ALJ's reliance on Plaintiff's failure to follow Dr. Cappuccino's suggested surgery violated 20 C.F.R. § 404.1530(a), *i.e.*, that *prescribed* treatment must be followed, and that therefore Plaintiff is not entitled to benefits, constitutes error. *See Young*, 633 F.3d at 471 (plaintiff's failure to undergo recommended, but not prescribed, surgery predicated on fear that surgery would worsen his back condition, and knowledge of others who did not benefit from similar surgery would not preclude disability benefits).

Based on the court's finding that Plaintiff is disabled because of degenerative disc disease of the lumbar spine, having met the criteria for § 1.04A of the Listing of Impairments, the matter should be remanded for calculation of benefits, and no further review of the remaining steps is required. However, because the decision is before this court for a report and recommendation, should the district judge disagree with the initial recommendation, the court proceeds to the next step of the inquiry.

**F.     Suitable Alternative Employment in the National Economy**

The ALJ concluded Plaintiff was unable to perform past relevant work as a office nurse and general duty nurse, and then determined whether Plaintiff would be qualified or suitable for any position within the national economy. (R. 19). The Second Circuit requires that "all complaints . . . must be considered together in determining . . . work capacity." *DeLeon,* 734 F.2d at 937. Once an ALJ finds a plaintiff's impairments prevent a return to previous work, the burden shifts to the Commissioner to prove substantial gainful work exists and that the plaintiff is able to perform in light of her physical capabilities, age, education, experience, and training. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

It is improper to determine a claimant's residual work capacity based solely upon an evaluation of the severity of the claimant's individual complaints. *Gold v. Secretary of Health and Human Services*, 463 F.2d 38, 42 (2d Cir. 1972). To make such a determination, the Commissioner must first show that the applicant's impairment or impairments are such that they permit certain basic work activities essential for other employment opportunities. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Id*. at 294.

An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work.[15] *Decker*, 647 F.2d at 294. In

---

[15]  "Sedentary work" is defined as: "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools....Jobs are sedentary if walking and

addition, the Commissioner must prove that the claimant's skills are transferrable to the new employment, if the claimant was employed in a "semi-skilled" or "skilled" job.[16] *Id*. at 294. This element is particularly important in determining the second prong of the test, whether suitable employment exists in the national economy. *Id.* at 296.

In this case, the ALJ properly determined Plaintiff was unable to perform any past relevant work. (R. 19). Plaintiff does not contest this matter. The ALJ's further determination that Plaintiff had the residual functional capacity to perform "light" work, however, is contested.

The Second Circuit has directed that where a disability benefits claimant cannot perform the full range of sedentary work, a strict, mechanical application of the Act's medical vocational grids is improper; rather, the plaintiff must be evaluated on an individual basis, and that such evaluation "can be met *only* by calling a vocational expert to testify as to the plaintiff's ability to perform some particular job." *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) (italics added) (reversing district court's decision

---

standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §404.1567(a).

[16] The regulations define three categories of work experience: "unskilled", "semi-skilled", and "skilled". *Decker, supra*, at 295.

"Un-skilled" is defined as: "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength....primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in thirty days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs."
20 C.F.R. §404.1568(a).

"Semi-skilled work" is defined as: "work which needs some skilled but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks."
20 C.F.R. §404.1568(b).

upholding denial of plaintiff's claim for disability benefits and remanding for further evaluation of plaintiff on an individual basis, including testimony by a vocational expert, given that the medical-vocational grids do not apply to claimants who are unable to perform the full range of sedentary work). Furthermore, following a vocational expert's testimony, a plaintiff must be afforded an opportunity to rebut the expert's evidence. *Id*. In the instant case, the ALJ failed to present to the VE information regarding Plaintiff's mental limitations of depression and anxiety, and non exertional limitations of fatigue and lack of concentration, thereby depriving the VE the opportunity to consider the impact of Plaintiff's non exertional limitations on Plaintiff's ability to work. (R. 294-310).

In particular, at the hearing, the VE testified, and reviewed Plaintiff's credentials and limitations, concluding that substantial gainful employment opportunities exist that an individual of the same age and education as Plaintiff, who was capable of, at most, light and/or sedentary exertion, was capable of performing. (R. 52). The ALJ posed additional limitations including able to lift up to twenty-five pounds, no constant bending, lifting, or twisting, and no standing or sitting more than twenty minutes. (R 52). The VE identified jobs Plaintiff was able to perform to include small products assembly, light, with total job titles of 513,000 positions nationally and 1,380 in the Western New York region. Id. The ALJ posed additional limitations for sedentary occupations including no constant bending forward while standing, no rotating the spine while sitting, no constant kneeling or repetitive squatting, or constant kneeling or squatting, occasional step ladder climbing, and no deep static crouching. (R. 52). The VE identified Plaintiff's past relevant work as a nurse and small parts assembler as viable occupations. (R. 53). The ALJ posed additional limitations of frequent standing and bending forward, static push

up to eighty pounds frequent squatting, occasional stair climbing, and one half of a kneel posture. Id. The jobs the VE identified that Plaintiff was able to perform include office nurse, light, skilled, with total job titles of 960,000 positions nationally, and 4,970 positions in the Western New York region. (R. 54). In response to a hypotehical posed by the ALJ including the ability to walk up to fifteen minutes with the use of a cane, stand for twenty minutes, and kneel for ten minutes, the VE identified as jobs Plaintiff was able to perform counter clerk position, light, unskilled, with 93,500 positions nationally and 1,640 positions in the Western New York area. (R. 55). However, this finding is not supported by the evidence in the record because the ALJ did not include Plaintiff's nonexertional mental limitations of depression and anxiety in the hypotheticals posed to the VE, and, as such, the VE's testimony included no consideration of Plaintiff's nonexertional limitations. 20 C.F.R. § 404.1545(c).

Significantly, the ALJ opined Plaintiff's "mild depression is considered not functionally significant" (R. 12), yet, nothing in the record contradicts or calls into question Plaintiff's diagnosis. Rather, the record establishes Plaintiff began drug therapy treatment for depression in February, 2006. (R. 220). On October 13, 2007, Dr. Kolbert diagnosed Plaintiff with depression and advised psychiatric counseling, which Plaintiff declined. (R. 434). On October 23, 2007, Plaintiff visited Dr. Tracy, a pain management specialist, who confirmed Dr. Kolbert's diagnosis of Plaintiff's depressive disorder. (R. 438). On December 20, 2007, Dr. Tracy evaluated Plaintiff and opined Plaintiff's moderate to severe depression and crying spells were a result of her chronic pain and diminished level of function. (R. 439). As such, any hypothetical posed to the VE should have included the non exertional limitations pertaining to Plaintiff's

depressive disorder. *Walterich v. Astrue*, 578 F. Supp. 482, 518 (W.D.N.Y. 2008).

Because the record provides substantial evidence Plaintiff exhibited depression, a mental limitation that may otherwise erode the residual functional capacity assessment for the Plaintiff, the matter should, alternatively, be remanded for a new hearing, including testimony of a VE directed to the combined effects of Plaintiff's mental impairments including anxiety and depression and its side effects on Plaintiff's ability to work, including light sedentary work.

## CONCLUSION

Based on the foregoing, Defendant's motion should be DENIED; Plaintiff's motion should be GRANTED, and the matter REMANDED for calculation of benefits.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     June <u>10</u>, 2010
               Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989); Wesolek v. Canadair Limited, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:        June 10, 2010
                    Buffalo, New York